PAGE MACH. CO. v. DOW, JONES & CO.

(District Court, S. D. New York. December 15, 1916.)

1. PATENTS ⟂322—INFRINGEMENT—ACCOUNTING.

The master's report on accounting for infringement of the Joy patents, No. 780,664 and No. 786,294, for printing telegraph receiver, reviewed, and rule for apportionment of profits laid down.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 590–595; Dec. Dig. ⟂322.]

2. PATENTS ⟂312(1)—INFRINGEMENT—ACCOUNTING.

On an accounting for damages for infringement against a user, complainant must show that he would have received the profits which he puts forward as the basis of his damages, and must show therefore that defendant on the balance of preferences would have preferred his invention, with its attendant cost, to the alternatives open to him, and it is of consequence that the "standard of comparison" is an article upon which the plaintiff holds a patent. Where profits are claimed, such proof need not be made, but it must be shown that the profits realized by defendant were made by the use of the invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544, 545; Dec. Dig. ⟂312(1).]

In Equity. Suit by the Page Machine Company against Dow, Jones & Co. On exceptions to report of master.

See, also, 230 Fed. 164.

J. Edgar Bull and Charles S. Jones, both of New York City, for plaintiff.

Frederick P. Fish and Emerson R. Newell, both of New York City, for defendant.

LEARNED HAND, District Judge. [1] I think that there is no gain in repeating the general outlines of this litigation, which sufficiently appear in the master's report. The most orderly way to approach the accounting is to take up the several phases of the defendant's telegraphs, with a view to seeing just which of the claims have been violated at the different periods. The total period between January 24, 1905, for patent 780,664, and April 4, 1905, for patent 786,294, until that machine appeared in 1912, which avoided the patent altogether, may itself be divided into three subperiods, during which the infringement differed. The first division is from 1905 until September, 1907, during which time the defendants have been held to infringe all the claims of 780,664 which were then in suit and the two claims of 786,294, and during which they are therefore liable for all the profits or damages arising from their use of the positively disengaging clutch of 786,294, the continuous paper feed without feeding the type-wheel of claim 12, of 780,664, and the constant stress on the paper feed of claims 1, 2, 3, 4, 5, 6, 23, and 30.

A change was made in September, 1907, about which there is only a little testimony and that only the testimony of Conger of April 8, 1914 (XQ228), who says that in September, 1907, the constant stress and the positively disengaging clutch were eliminated. As to the con-

stant stress, we have only his word that the "paper-feeding shaft was not under constant stress, but was operated at the proper time by a clutch which was thrown in when the paper was to be fed." As to the positively disengaging clutch, we know what was substituted, because of the diagram in evidence, "Drawing of Defendants' Present Clutch."

To take up the last detail first, I am quite clear that it does not infringe patent 786,294, because there is no such means of positive disengagement as is called for by the claims. In figure 3 of that patent it appears that the disk *4* will be drawn to the right on the thread until the pin *8* clears the ratchet on the disk *3*, and then it will stop. The disk will be wholly disengaged. In figure 1 it is not so clear that the disengagement will be absolute. In that case, after the disk *O* moves to the right on the thread and abuts on the stop *R*, it will still continue and pull away the friction disk *G* of the clutch, from its other disk *F*. The disk *G* will cease rotating when the further tension of the spring balances the remaining friction between *F* and *G*. It is true, therefore, to say that "positively disengaging" of the claims may include a slip between the faces of the clutch. However, it is equally true to say that it necessarily involves some positive diminution of that friction, and it is just this that the defendants have not used. They have used figure 1 about as it stands, but with the stops, *R, R,* removed, and the result of their removal is to leave the friction always constant between the disks. This is to avoid the very heart of the invention. I therefore find that there was no infringement of patent 786,294, after September, 1907.

Coming now to the constant stress element, which is the only other factor in the case, besides claim 12, it is concededly absent in the "contempt" machine, and the question is of its presence from September, 1907, to January, 1909. All we have is the statement that the shaft was not under constant stress, but was thrown in by a clutch. Obviously, this does not answer the words of the claims 1, 2, and 3, or of claims 23 and 30, as Judge Hazel construed them. (C. C.) 166 Fed. 479, 480. I am in some doubt as to his meaning touching claims 4, 5, and 6; but, taking the claims as they read, I think that they can include only "constant stress," no matter what the patentee may have tried to cover. A shaft, which is out of connection with the driving shaft by an open clutch, certainly seems to me quite without the language of those claims. Indeed, if not, I cannot see how the Wright patent, 466,-858, is avoided. I conclude therefore that, so far as we have any evidence in the case, there is not enough to bring the second machine and the "contempt" machine, within any claims of the patent but claim 12. Although upon such an accounting the plaintiff may bring in any other machines than that used as an infringement, of course, the burden of proof lies with it to show that each new machine is an infringement. At least, I must hold that the plaintiff has not shown that the second machine infringes any claim but claim 12.

Since for the period between September, 1907, and December, 1912, only claim 12 is infringed, the next question is whether that claim can be the basis of any damages or profits. I shall, of course, assume that

both the second machine and the "contempt" machine violate that claim, since that is the law of the case; but it by no means follows that the advantage given by the feature involved in the claim had any pecuniary value. The defendants' position is that the claim is for a combination which could not in fact be made to perform what it purported to do. It was for "means for continuously feeding the paper without feeding the type-wheel," and there were no such means, at least none which were capable of any commercial exploitation. The truth of this is certainly established beyond any question; one cannot in practice safely feed the paper in either the plaintiff's or the defendants' machine without advancing the type-wheel. If therefore the claim were for a function, it could not, indeed, have been infringed, and for the matter of that the disclosure would have been insufficient to support it. But, if the claim were functional, it would be invalid anyway; that question is not open before me, though, indeed, it may be thought to be invalid in the Circuit Court of Appeals. As it stands, I must read it as referring to a certain co-ordination of mechanical elements, comprising a definite part of the machine. Whether it will work as the patentee supposes is another matter. The only question is whether, taking it to mean what I must take it as meaning, that combination of parts exists and is of service to the defendants. That it exists I must assume; whether it was profitable is a question having very little relation to the question whether it would perform the function, ascribed to it by the patentee. I conclude that, having organized their machine in direct imitation of that feature covered by claim 12, the defendants cannot so easily escape as by calling attention to the error of the patentee in the functions he thought his machine would perform.

Now, the elements comprised in claim 12, so understood, had not existed before, and there were no standards of comparison which could have been successfully substituted. It makes no practical difference whether under Columbia Wire Co. v. Kokomo, 194 Fed. 108, 114 C. C. A. 186, the time be taken as the date of the patent or the date of the infringement, because nothing appeared in the art from January 24, 1905, to January, 1909, which offered any substitute better than the Essick machine, or Joy, 676,137, or Merritt & Joy, 558,506. Neither of these would have answered. As to the Essick machine, it is quite obvious that the defendants were not disposed to deal with it after the spring of 1900. See their letters of May in that year. They wanted something faster to compete with the new Western Union machine about to be introduced. Joy, in September, 1900, filed an application which resulted in patent 676,137, and this was made the basis of a contract between the parties of November 6, 1901; but, for a reason not altogether clear, it never seems to have been used, because before that date Joy had completed the machine of the patent in suit for which he filed an application in August, 1902. This was in fact substituted for the machine of 676,137, throughout the period of the contract until October, 1905. The plaintiff insists that the defendant could have used any one of these with as much success as either of the three infringing machines, but I think not. As I have said, the Essick machine was too slow to meet competition, and so, too, I think I may

assume was the Essick patent. At least, the defendant has since 1901 shown a persistent preference for a telegraph in which both type-wheel shaft and carriage shaft are driven by a single constantly rotating shaft. As for Joy, 676,137, and Merritt & Joy, 558,506, they were also too slow. In Merritt & Joy, 558.506, it was necessary to move the carriage at least 20 spaces to get an added line space, and this took 12 seconds. I know that Conger says it would take only 5 or 6 spaces, but Joy's testimony is based upon actual measurement of the length of the wire and must be accepted. Considering that the blank lines form nearly one-half the printed page, a loss of over 10 seconds in each blank line was a serious handicap in the Merritt & Joy machines. Moreover, they seem to have been continually causing trouble in Chicago, though used there for eight years, and it is perhaps true that they would not have been possible at all in New York; that question I do not answer.

[2] It is not enough, however, to show that the defendant would have preferred to infringe the patent than to adopt a part of the prior art; the plaintiff must show that that preference would have been strong enough to compel it to pay the reasonable royalty rather than to adopt such patents, since the right to damages depends upon the probability that but for the infringement the plaintiff would not have lost. Hence we have the rule of "standards of comparison," by which, if it be shown that there were substitutes open to the infringer which it would have used rather than pay the patentee, no damages are recoverable, and in that event he must be relegated to such profits as may be shown to have arisen by the use of the infringement over what would have been derived from the substitute. McCreary v. Pennsylvania Canal Co., 141 U. S. 459, 12 Sup. Ct. 40, 35 L. Ed. 817, was a case, not of damages, but of profits, and the rule was that recovery must be limited to the profits arising from the improvement, though the "standard of comparison" was owned by the very patentee. That case gives no color for the assumption that in a case involving damages it is irrelevant that the supposed standard is within the plaintiff's control. We must carefully distinguish the very different questions arising in each case. When we are dealing with damages, the plaintiff must show that he would have gathered those profits which he puts forward as the basis of his damages. He must therefore show that the defendant on the balance of preference would have prefered his invention with its attendant cost to the alternatives open to him. In the choice between such alternatives, we must figure the royalties necessary to secure their use when they are not already in the public domain. Yet it makes no difference whether the supposed patented "standard of comparison" is owned by the plaintiff or third parties. The point is that the existence of a monopoly over such a "standard" is a relevant fact in considering the preference between them.

Such is the explanation of McCreary v. Pennsylvania Canal Co., supra, a decision inevitably following from the facts at bar, but of no application to the discussion of damages here. Now, it is quite apparent here that the plaintiff would not have entertained any offer for the use of Merritt & Joy (which it controlled, even if the legal title

was not in it), which would have been tempting to the defendant as against the patent in suit. Nor did the situation change in this regard after September, 1907, when the positively disengaging clutch and the constant stress features were eliminated, because, as I have shown, the actual organization covered by claim 12, if it be infringed at all, was just what permitted that saving in time to accomplish which had been thought so important in 1900.

There was therefore ground for an attempt at estimating a reasonable royalty; for there was no established royalty, no lost sales, no damage through competition. Moreover, in such an attempt there was justification in making inferences and estimates; this is certainly the presupposition of the later cases. I tried to show the sort of way in which such cases should be treated in Consolidated Rubber Tire Co. v. Diamond Rubber Co. (D. C.) 226 Fed. 455. But this case was not presented on that theory; the whole idea of reasonable royalty was an afterthought of the master, after the case was closed, admirable as such, but without sufficient support, because the presupposition of it all is that the rental of the machines is a basis of royalty, which on reflection is certainly untrue. The service rendered by the plaintiff was to furnish and maintain the machines together with an operating and charging plant. At the very least the interest on the cost of the machines with an allowance for obsolescence must come out of the rental. That these elements are most substantial is apparent at once. Let us assume that the machines cost $100 (Joy says $75 to $100, and the defendant's machines cost $101). The cost of the pedestals we do not know; they may easily have cost $15 with their covers, as the defendant suggested. We start with an investment of $115, on which an interest charge of 10 per cent. at least must be allowed, following the agreement contained in the ninth article of the agreement of November 6, 1901. An allowance of 10 per cent. for obsolescence and decay would be quite within reason; indeed, the defendant's own construction account shows a depreciation in 8 years of 50 per cent., although much greater repairs were put on than on the plaintiff's machine. A yearly allowance of 20 per cent. on $115 is $23, which, with $6 repairs conceded, makes an allowance of nearly 50 per cent. of the gross rentals. We have no knowledge of what other expenses the plaintiffs' business entailed, though we do know that it has expended $150,000 in development. Without some statement from its books of all these matters, obviously nothing can be definitely found; until that has been exhausted, there is no room for the calculation of a reasonable royalty, and the case must stand on the accounting for profits just as it started.

When we come to a consideration of profits, the question of a "standard of comparison" is of little consequence, because the plaintiff need not show that the defendant would have used his patented invention, if he had not infringed. Yet as the plaintiff is pursuing the defendant as a trustee ex maleficio, asserting that some part of those profits are the result of using his patented invention, it is incumbent upon him to show that they were made by using the invention. McCreary v. Pennsylvania Canal Co., supra, was a case where the plaintiff could not do so, because it nowhere appeared that the profits in any sense resulted

from the improvements of the specific patent over the generic. In the case at bar there is some reason to believe that without the improvements of the patents in suit there would have been no profits at all, because it is quite clear, as already mentioned before, that the competition of the new Burry machine the defendants thought very threatening indeed. Such a conclusion, however, cannot be certainly made, and, if the plaintiff had to rely upon it, it might fail. It may have recourse I believe, therefore, to the rule of Westinghouse v. Wagner, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, applying to patent causes the rule of liability in other cases of confusion by a trustee ex maleficio. While it may be true, therefore, that other features of this machine besides those patented actually contributed to the total success, it is absolutely impossible to establish quantitatively how much they did contribute. That the profits were in part "attributable" to the improvements allows no reasonable doubt, not only because of the defendants' pressure on the plaintiff to devise a new machine in 1900, but because of their tenacity in clinging to the patent as long as possible. It is apparent that they deemed it of the highest consequence to maintain at once a single rotating shaft for carriage and wheel together with a paper feed which could operate without more than a single advance of the carriage. Under these circumstances, the quantitative ascertainment of the contribution of each element certainly falls upon the defendants, else the desire to do exact justice destroys the power of doing any justice at all.

Coming, therefore, to the calculation of profits, I shall first consider how much of the total profits of the business was attributable to the ticker department, and then how much of the ticker profits were attributable to the machine. That will be as far as I think we can go. The parties are not so far apart in their methods of calculation as might at first blush appear from their results. Each proceeds upon the assumption, as indeed each must, that the gross sum from which the deductions are to be made is the total ticker returns for the period in question, which amount to $932,196. The first item of credit on this account is that of the ticker operating expenses, $396,997. As these are itemized, we know that they contain no items of construction, and the only questionable item is the payments made to Landfear or his heirs. The plaintiff insists that, as these were for devising the very infringement in suit, they should not be allowed. I think not. Landfear at the time of his original efforts did not know, and had no reason to suspect, that he was contriving an infringing machine. The record is a little thin, but I understand the situation to be that a contract was made with Landfear before his patent was issued, in July, 1904, giving him a royalty. In any case, there is no evidence that, when the contract was made, either Landfear or the defendants knew of the plaintiff's patents. There was nothing illegal in this, nor is the case within Crosby Valve Co. v. Safety Valve Co., 141 U. S. 441, 457, 12 Sup. Ct. 49, 35 L. Ed. 809, where the master refused to credit the infringer with the cost of unsuccessful experiments. These payments seem to me like any other payments made to designers or skilled artisans.

The next element is that of getting the news, $851,363, and the next that of general business or "overhead" charges, $349,033; the two amounting together to $1,200,396. I shall accept the plaintiff's method in reckoning this, taking such a proportion of it as the gross ticker revenue represents of the total gross revenue, 27 per cent. The only dispute between the parties in that respect turns upon whether advertising receipts should be included in the Journal revenue, when apportioning the news disbursement. Advertising is, of course, the direct result of circulation, and circulation, of news. Thus the news in a paper contributes as much to the advertising revenue as to the subscription. The proper percentage of these two items is $324,107.

The next item is "administration" expenses, which means no more than the salaries of executive officers. I quite agree with the plaintiff that there is reason to suppose that after 1908 the defendant's officers, who were the principal owners, decided to distribute actual profits by way of salaries. This event coincides appropriately in time with Judge Hazel's decisions in April and June of 1908 ([C. C.] 166 Fed. 473), and suggests that the purpose was to avoid the showing of high profits. Such devices the court will defeat. Rubber Co. v. Goodyear, 9 Wall. 788, 803, 19 L. Ed. 566. I have not, however, thought it fair to allow only the sums suggested by the plaintiff. It seems to me that as the business had grown from a gross in 1905 of $296,700, to a gross in 1908 of $416,000, an increase in aggregate salaries from $17,300, to $26,600, was most reasonable. As the business still grew a little, I think that for the last four years an average of $30,000 is a fair estimate. This results in a total deduction from the "administration" expenses of $178,800, leaving a balance of $109,620, of which 27 per cent. is $29,597.

The canvassing charge was for so much of such services as were addressed only to the Bulletin and Ticker between whom they were divided equally. One-half of it amounts in all to $15,817.

The total investment in machine construction was $87,111, and the depreciation as estimated by Hopkins was $42,111, which should be added. Thus the total deductions were as follows:

| | |
|---|---:|
| Ticker operating | $396,997 |
| News and business | 324,107 |
| Administration | 29,597 |
| Canvassing | 15,817 |
| Depreciation | 42,111 |
| Total | $808,629 |

The difference between this figure and the total receipts is $123,556.

This sum represents the profits made upon a service which included, not only the use of the machines, but the whole news service as such for which the defendants received $30 a month up to May 1, 1909, and $40 thereafter. Obviously, it would be unjust to attribute all this profit to the patented inventions, even if the value of the machines depended wholly upon those inventions. How then may we apportion these profits between the machine and the service as a whole? In the absence of any better method, I think we may make the division upon the basis of the relative cost of the two. This involves the assumption

that the profits on the machine were equal for every dollar spent as for every dollar spent upon the other expenses of the service. The actual cost of the machines, together with that part of the "ticker operating expense" made up of parts or repairs on the machines, amounts to a very small part of the total expenses of the ticker service, as I have found them. Even after we credit to that expense its proportion of business and administration and canvassing expenses, it amounts, as I figure it, to about one-eighth of the whole expense of the ticker service. However, it is impossible to tell with certainty from Hopkins' "Ticket. Expense Sheet" just which of the items on that list properly belong to the machines. Some of the other items were unquestionably in part for the machines. A better way is to assume that the cost of the service formerly rendered by the plaintiff of $5 represented the same proportion of the total service of $30 to the customer as it did represent of the total service when the defendant began to manufacture the machines for itself. This would make the profit on the machines one-sixth of the total profits. If one-eighth of the total profits were taken, the proper award would be about $15,500; if one-sixth were taken, it would be $20,593. Exactness is obviously out of the question, and it would be a sham to pretend to it. The matter being in doubt, a doubt caused by the defendants' acts, it is fair to take the resolution of it against them. Therefore I shall award the sum of $20,000 as profits arising from the machines.

It will be urged, perhaps, that consistency might require me to go further and attribute to the invention only so much of these profits as the cost of the patented parts bore to the cost of the whole machine. I am quite aware that the method of dividing the profits of the ticker service as a whole by the division of the cost is itself artificial. The fact is that the relative contribution of two or more essential factors to a common result cannot be ascertained quantitatively. But we must adopt some working rule to avoid instances of grotesque injustice. It shocks the sense of justice of any one to take away the whole of the profits of a business because its owner has used a single small patented detail; for long courts stood powerless before this situation, but now we have a different rule. If, however, we are to apply it with ruthless logic, our second situation will be as bad as our first, and a single patent infringement may become the signal of financial ruin, though it was accompanied by the best of faith. I think that we must show that the law can be more plastic even at the expense of formal consistency. Surely it is a strange habit of mind which at once tolerates the extreme latitude allowed to juries in the assessment of damages, because their processes are not disclosed, while it insists upon an impossible nicety of calculation even at the expense of any justice whatever, when they are.

As respects carrying the rule further, nevertheless, there are good reasons for refusing to do so. As I have said, there is ground to suppose that the patented elements may well have contributed just the differential value which made any profits possible. The defendants at least are unable to prove that this reasonable possibility was not actual, and the proof is with them. Again, the patented combination

neither verbally nor actually consists of the last element of claim 12; it is for that element in juxtaposition with the whole machine. If it were possible to show what the added profit was when the element was used, that would serve; but the defendants' attempts in that direction are too clearly inadequate to need discussion. Their payments to Landfear alone are larger than the savings they admit. To permit a further division upon the basis of the relative costs of the parts to the whole machine would for these reasons, I believe, sacrifice the realities as we can see them from the case as a whole.

As to interest, I shall follow my own ruling in Consolidated Rubber Tire Co. v. Diamond Rubber Co. (D. C.) 226 Fed. 455, 463. This will award interest from June 20, 1908, upon that part of the award for the period before September, 1907, and upon the balance from November 2, 1912. This makes the interest begin from the several dates when it had been decided that the different infringements were such.

The final question is of punitive damages. As I have said, I do not think that up to the issuance of the patents the defendants had any reason to suppose they were wrongdoers. They did go on and put out machines in the face of those patents, but I do not see that in so doing they were guilty of any bad faith. There was no time that I can discover until November 2, 1912, that it could be said they knew they were infringers. Patents are full of casuistry; the test of invention is among the most elusive and fugitive in the law. I should be unwilling to punish one who honestly attempted to avoid a patent, merely because it was eventually determined that he failed. The statute was intended, I think, for persons who know they are wrongdoers. That is not apparent here.

A decree will therefore go with costs of the accounting, but not up to the interlocutory decree, since the plaintiff lost upon some of the claims in suit.