### A. B. DICK CO. v. MARR.
### No. 97.

Circuit Court of Appeals, Second Circuit.
June 26, 1946.

Edward D. Bolton, of New York City (C. P. Goepel and Edward D. Bolton, both of New York City, of counsel), for appellant.

Robert W. Byerly, of New York City (Robert W. Byerly and Ralph M. Watson, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from a final decree awarding the plaintiff profits arising from sales of stencil sheets by the defendant which were held to have infringed U. S. Letters Patent No. 1,526,982. Claims 2, 3, 4, 6, 7, 11, 16, 18, 21 and 22 of the patent were held valid and infringed in an interlocutory decree granted by Judge Patterson. A master was appointed to ascertain and report defendant's profits, and the latter's report was confirmed by the trial court which fixed profits realized by the defendant as reported by the master.

The patent in suit has been before this court on several prior occasions and has uniformly been held valid by us. A. B. Dick v. Simplicator Corporation, 2 Cir., 34 F.2d 935; A. B. Dick v. Shallcross Co., 2 Cir., 42 F.2d 169, and A. B. Dick v. Duplicating Machine & Supply Corp., 2 Cir., 72 F.2d 268. The same result has been reached in the Third and Seventh Circuits.

Arlac Dry Stencil Corp. **v. A. B. Dick,** 3 Cir., 46 F.2d 899, and Heyer Duplicator Co. v. A. B. Dick, 7 Cir., 59 F.2d 787. The invention relates to improvements in stencil sheets. As we said in Dick v. Simplicator, 2 Cir., 34 F.2d 935, 936:

"A stencil sheet is a sheet adapted to be converted into a stencil for multiplying copies with less equipment than by printing, particularly in machines which position the paper and stencil and apply ink, so that it passes through the appertures in the stencil and reaches the paper."

To make such a stencil sheet the patentee says in his specification that he employs "a base of open-texture, porous material of any suitable character, such, * * * as the Japanese bibulous paper commonly known as 'Yoshino.' This," he says, "I coat or impregnate with a cellulose ester, such as cellulose nitrate or cellulose acetate, by treating the paper with a solution of such cellulose ester in a suitable solvent. The material which I prefer to employ and with which excellent results may be obtained is known as 'pyroxylin enamel,' this being a solution of nitrated cellulose in a suitable solvent, with which has been incorporated a pigment such as zinc oxide. As commercially available at the present time, this enamel has the consistency, approximately, of ordinary molasses. As is well known, the consistency of pyroxylin enamel is governed by the relation between the solid constituents (such as cellulose nitrate, zinc oxide etc.) and the solvent employed (such as amylacetate).

"To a given quantity of this pyroxylin enamel I add a suitable proportion (fifty per centum will give good results) of a tempering agent such as an oil, mixing this thoroughly with the enamel and, if desired, adding coloring matter such as a dye or carbon black which may have been previously dissolved or suspended in amylacetate. The chief function of the tempering agent is to prevent the pyroxylin enamel from drying too hard, making the coating undesirably brittle. For this purpose I prefer to use castor oil or a similar oil having the power of forming with the cellulose ester and its solvent a homogeneous body."

The following claims, 2 and 18, are typical and were found in the interlocutory decree to be infringed by stencil AF:

"2. A stencil-sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising a base having a type-impressible coating including a cellulose compound and a tempering agent."

"18. A stencil-sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising an open-texture base having a coating including a cellulose ester and a tempering agent."

In A. B. Dick v. Shallcross Co., 2 Cir., 42 F.2d 169, 170, 171, we gave the claims of the patent in suit a broad construction saying that:

"The patent is limited to no formula, but only teaches that a proper coating for dry stencil sheets should have a small percentage of nitrocellulose and a large percentage of soft materials of an oily character. * * * Hill's specification does not require that castor oil or any oil shall be used. It says: 'To a given quantity of this pyroxylin I add a suitable proportion * * * of a tempering agent such as oil. * * *' Moreover, even if oil itself were intended as the tempering agent for Hill's stencil sheets, the test of what is oil is not the chemical meaning of the word but its general meaning, so long as the ingredient used is 'such as an oil' and serves the purpose of a tempering agent."

The defendant sold stencil sheets made by Ellams Duplicator Company of London, England, which are the articles alleged to infringe. While the validity of the patent is not questioned it is argued that the stencil sheets known as types MO 37 and MO do not come within the claims. The stencil sheets before Judge Patterson were known as type AF and were found to contain 3.8 per cent waxy material, 7.1 per cent nitrocellulose, 71.6 per cent liquid oily material and small proportions of other ingredients. This AF type of stencil was held to infringe the claims and such infringement is not and cannot longer be disputed. On the accounting the special mas-

ter allowed proofs to proceed as to other stencils sold by the defendant particularly those known as types MO 37 and MO. The constituents of MO 37 stencils were 75.9 per cent of liquid oily material and 14.7 per cent of nitrocellulose. The constituents of MO stencils were from 61.2 per cent to 76.18 per cent of liquid oily material and from 14.81 per cent to 19.87 nitrocellulose.

It is argued that oil was not used as a tempering agent in any of the stencils alleged to infringe other than type AF. It was not used in the stencil we dealt with in A. B. Dick v. Shallcross Co., 2 Cir., 42 F.2d 169. There the tempering agent was oleic acid and the stencil was held to infringe. At page 171 we said:

"It softens the pyroxylin so that it will not become hard like enamel after the evaporation of the solvent and has an effect similar to the castor oil recommended both in the patent to Hill and the patent to Shallcross. But Hill's specification does not require that castor oil or any oil shall be used."

The plaintiff's expert Grosvenor testified that the oil liquid found in Exhibit 8, which was stencil type AF, "has substantially the effect on nitrocellulose that oleic acid would have." (Record p. 14.)

The testimony of the experts Grosvenor and Worden show that types AF, MO 37 and MO each had a coating which included "a large percentage of oily material and a small percentage of nitro-cellulose distributed through the oily material as a binder therefor" and thus in terms infringed Judge Patterson's decree.

The percentage of oily material to nitrocellulose found in stencil MO was smaller than in the other types yet it was practically the same as that found to infringe by this court in A. B. Dick v. Simplicator Corporation, 2 Cir., 34 F.2d 935. (See Record p. 654.)

Grosvenor testified that the various oily materials tempered the nitrocellulose in the stencil sheets. So Mr. Crawford, the first master, and Mr. Kirschstein, the second master, found, and such was the finding of the District Court. We cannot say their findings were erroneous.

The defendant asserts that there were other types of stencil sheets sold than those sold under the names of AF, MO and MO 37, but none of such other types, nor those referred to as AF, MO or MO 37 were distinguished on the defendant's books though he was given the opportunity to show that they were of a different composition.

The defendant's most urgent argument against the finding that stencil sheets other than those of type AF infringed the patent in suit is that the MO and MO 37 sheets contained mineral oil, wax and amyl-stearate, and that amyl-stearate will change the physical structure of the nitrocellulose. But the AF sheets, which confessedly infringed the patent in suit, contained some mineral oil and amyl-stearate. Moreover it does not follow that these ingredients if, as found to be the fact, they served to keep the nitrocellulose soft would not act as a tempering agent. Our prior decisions as to the scope of the patent show that the test of what is a tempering agent is not a chemical but a practical one. The testimony upon which the findings we have referred to were made shows that defendant's stencils AF, MO and MO 37 met the practical test.

It is further to be observed that according to defendant's own expert Worden the action of both mineral oil and castor oil upon nitrocellulose was the same. (Record p. 245.) In addition to this, Percy Jepson, a director of Ellams, who sold the stencil sheets to the defendant, testified that the amyl-stearate used was "a synthetic product supplied for mixing with nitrocellulose to make elasticity in compounds," that it was "of an oily nature," and that it was "a liquid." (Record p. 64.)

The issues as to the scope of the claims and defendant's infringement are not determined by whether the tempering agent is an oil under a mere chemical definition, but whether it is "such as oil" and, like the castor oil recommended in the specification, will "prevent the pyroxylin enamel from drying too hard" and "making the coating undesirably brittle." The tempering agents employed by the defendant fully answered the claims as heretofore defined by the courts.

██ The special master, Morris Kirschstein, in a carefully reasoned report, made an award to the plaintiff of $18,799.40, which was fully supported by the evidence. In confirming it Judge Hulbert made the subjoined findings.[1]

██ The defendant criticizes the findings of the master on the ground that the amyl stearate used in the defendant's sheets does not precipitate the nitrocellulose as the "preferred" castor oil recommended in the specification does but dissolves it and destroys its fibrous structure. This criticism however is quite irrelevant. What is called for by the claims as read in the light of the specification is not a sheet in which the structure of the fibrous pyroxylin coating is retained, but one in which the coating made of pyroxylin enamel is by the use of a tempering agent "such as oil" prevented from becoming too brittle. The coating, whether castor oil or amyl stearate be employed as a tempering agent, forms "with the cellulose ester and its solvent a homogeneous body" and thus is within the claims of the patent. Indeed, defendant's witness Jepson testified that the amyl stearate used for stencil sheets sold to the defendants was of an oily nature that softened the nitrocellulose. Defendant's stencils, therefore, infringed the claims.

██ The remaining questions raised by the appeal relate to the accounting. The defendant objects to the amount of the award on the ground that it was based upon a statement of account in which losses and gains from sales of infringing stencil sheets were segregated, rather than upon

---

[1] 10. The so-called "A.F." stencil sheet comprised an open, porous base of Yoshino paper having a homogeneous, ink-impervious coating including a large percentage (71.6%) of oily material, and a small percentage (7%) of nitro-cellulose distributed through the oily material as a binder therefor.

11. Tests performed on the so-called "A.F." stencil sheet showed that it was "a stencil sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising a base having a type-impressible coating including a cellulose compound and a tempering agent."

12. The oily material in the so-called "A.F." stencil sheet was a liquid whose composition was not given by the manufacturer because it was claimed at the trial to be a trade secret but it was shown to contain mineral oil, amyl stearate and some wax or waxes.

13. The so-called "M.O. 37" stencil sheet comprised an open, porous base of Yoshino paper having a homogeneous, ink-impervious coating including a large percentage (75.9%) of oily material, and a small percentage (14.7%) of nitro-cellulose distributed through the oily material as a binder therefor.

14. Tests performed on the so-called "M.O. 37" stencil sheet, similar to the tests performed on the so-called "A.F." stencil sheet, showed that it was a "stencil sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising a base having a coating including a cellulose compound and a tempering agent."

15. The oily material in the so-called "M.O. 37" stencil sheet was a liquid whose composition was not given by the manufacturer because it was claimed to be a trade secret, but it was shown to contain mineral oil, amyl stearate and some wax or waxes.

16. The so-called "M.O." stencil sheet comprised an open, porous base of Yoshino paper having a homogeneous, ink-impervious coating including a large percentage (from 76.18% to 61.2%) of oily material and a small percentage (from 14.81% to 19.87%) of nitro-cellulose distributed through the oily material as a binder therefor.

17. Tests performed on the so-called "M.O." stencil sheet, similar to the tests on the so-called "A.F." and "M.O. 37" stencil sheets, showed that it was "a stencil sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising a base having a type-impressible coating including a cellulose compound and a tempering agent."

18. The oily material in the so-called "M.O." stencil sheet was a liquid whose composition was not given by the manufacturer because it was claimed to be a trade secret but it was shown to contain mineral oil, amyl stearate and some wax or waxes.

19. The liquid oily material contained in the so-called "A.F.," "M.O. 37" and "M.O." stencil sheets functioned as a tempering agent for the nitro-cellulose in the proportions in which they were contained in the respective stencil sheets, and the differences between them were merely colorable.

the net balance of gains and losses. He contends that the losses should have been deducted from the gains for the reason that all the infringements occurred in the course of his conduct of continuous business. But the losses did not result from the particular transactions in which there were gains and, therefore, under the rule of Duplate v. Triplex Co., 298 U.S. 448, 458, 56 S.Ct. 792, 80 L.Ed. 1274, could not be used as an offset to the profits. As Mr. Justice Cardozo said in that decision, 298 U.S. at page 458, 56 S.Ct. at page 796:

"The owner of the patent, in holding the infringers to an accounting, is not confined to all or nothing. There may be an acceptance of transactions resulting in a gain with a rejection of transactions resulting in a loss. Upon a statement of an account, a patentee is not looked upon as a 'quasi-partner of the infringers,' under a duty to contribute to the cost of the infringing business as a whole. * * * He is the victim of a tort, free at his own election to adopt what will help and discard what will harm."

In the case at bar Burns, a credited accountant, who made up the statement, testified that he could segregate the profitable from the unprofitable items sold and gave adequate reasons based upon data before the court.

It is evident from the foregoing that the trial court adopted the correct method of accounting when it made use of the statement segregating the losses and gains from the sales of infringing stencils and that it properly declined to credit the defendant with the losses when charging him with the gains.

■ The defendant also objects to the computations of the master because the latter, in calculating the profits realized from the infringing stencils, did not credit the defendant with merchandise on hand at the beginning of the accounting period valued at $9,012.44. It is argued that because that amount of stencils and other merchandise was on hand at the beginning of the accounting period that entire amount should be treated as part of the cost of merchandise sold. But, at the end of the accounting period, there was only on hand merchandise of the inventory value of approximately $5,000, so that the cost of purchases made during the accounting period plus the original inventory of $9,012.44, less the $5,000 representing goods on hand at the end of the accounting period, would furnish the basis for computing the cost of merchandise sold. If the ratio between sales of stencils and other merchandise bought and sold during the accounting period be applied to the items of costs and sales, we have the following result under the computation of the master:

### Prime Cost

| | |
|---|---|
| Purchases of vellam tissue ..... (Exhibit A, Schedule 1 of Sp. Master's Ex. 5A) | $67,295.79 |
| Cost of stencils sold from inventory on hand February 28, 1930 ...................... (As per my rulings on Objections Nos. 1c and 1d) | 3,122.48 |
| Purchases of stencil material .. (Exhibit A, Schedule 1 of Sp. Master's Ex. 5A) | 12,386.66 |
| Stencil labor ................. (Exhibit A, Schedule 1 of Sp. Master's Ex. 5A) | 16,335.58 |
| Total ................ | $99,140.51 |

The foregoing total of cost when apportioned between profitable and unprofitable sales gave a prime cost for profitable sales of $85,017.27 to which $37,850.72 for expenses of overhead applicable to profitable sales was properly added, making a total of $122,867.99. The net amount of profitable sales was $141,667.39. Upon the foregoing figures the master charged the defendant with a profit on sales as follows:

| | | |
|---|---|---|
| Total sales at a profit | | 141,667.39 |
| Cost attributable to such sales | | |
| Prime cost | $85,017.27 | |
| Overhead | 37,850.72 | 122,867.99 |
| Net profit for which defendant is to account | | $18,799.40 |

■ The objection of the defendant to the refusal of the master to make any allowance for stencils spoiled or given away as samples was rightly overruled. Burns'

testimony shows that his computation of prime cost covered all cost to the defendant for stencil tissue, stencil labor and stencil merchandise. It therefore became immaterial whether some of the merchandise may have been spoiled or given away, for neither disposition would add to the defendant's out-of-pocket expense for the merchandise, but would only deprive him of a chance to realize a possible profit from infringing sales that were never in fact made.

The objection to the use of the total number of quires of stencil paper sold—rather than of the amount per square inch —to determine the profits cannot be sustained. The defendant's sales were admittedly made on a quire basis and we can see no reason why cost should not be computed in the same way even if any other method was possible. If the infringer wished to prove that this was an improper basis for computing the profits he should have offered something more specific than general testimony that the quires varied in size —particularly when the quire represented the basis for all his own purchases and sales. He offered no evidence to show that he was damaged by the employment of a quire basis. It was his business to prove that he suffered damage from that mode of computation, if he seeks to have another method employed. Indeed his own expert Miller made his calculations upon a quire basis.

It is claimed by the defendant that the California corporation, of which the defendant was the president and sole stockholder, was a separate entity and, therefore, that the infringing sales and other transactions by it should not have entered into the accounting. But it was stipulated that the overhead to be used should be that of defendant's combined New York and California offices. Under these circumstances, and in view of defendant's own testimony, it is quite impossible for us to hold that findings based upon treating the acts of infringement of the California corporation as those of the defendant were without substantial foundation. The corporation was organized before the decision of Judge Patterson was rendered and the

interlocutory decree was entered, but after this suit had been brought and a preliminary injunction had been granted. Under all the circumstances it was properly held to be the defendant's alter ego in making the infringing sales. Westinghouse v. Allis-Chalmers Co., 3 Cir., 176 F. 362, 367, 368.

We have considered other criticisms of the defendant as to the disposition of the account by the master and the trial judge and find them without merit, principally because the rule for accounting in situations like the present implicit in the decision of the Supreme Court in Duplate Corp. v. Triplex Co., 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274, precludes any results other than those arrived at.

The objection to the findings on the ground that they were not sufficiently specific is also without merit. They clearly covered the ultimate facts and were not required to set forth the details of the evidence.

The judgment for the plaintiff is affirmed with costs.